UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Joshua H. Crittendon,<br><br>　　　　　Plaintiff<br><br>　v.<br><br>Ahjalee Cooper,<br><br>　　　　　Defendant | Case No. 2:20-cv-02062-CDS-VCF<br><br>**Order Denying Motion for Summary Judgment**<br><br>[ECF No. 40] |

　　　Incarcerated pro se plaintiff Joshua H. Crittendon brings this § 1983 action against correctional officer Ahjalee Cooper alleging that she used excessive force on him and retaliated against him for filing a grievance while he was housed at High Desert State Prison (HDSP). *See generally* ECF No. 6. After screening the complaint, United States District Judge Gloria Navarro[1] determined that Crittendon's only cognizable claims were against Cooper for excessive force and retaliation. ECF No. 5 at 16.[2] Cooper moves for summary judgment. ECF No. 40. Crittendon does not respond to the motion, and the time to do so has passed. At the summary-judgment stage, I must consider the merits of the underlying claims, despite Crittendon's failure to respond. Because genuine disputes of material fact preclude summary judgment, I deny Cooper's motion as to both claims and conclude that Cooper is not entitled to qualified immunity. This case proceeds to trial.

---

[1] Judge Navarro presided over this case until it was administratively reassigned to me in April 2022. ECF No. 30.

[2] Crittendon had leave to amend his complaint to cure the deficiencies identified in the screening order. ECF No 5. at 15, 17. He chose not to file an amended complaint, so his initial pleading is operative, and the only claims that remain are those identified in the screening order.

I.      Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). The court's ability to grant summary judgment on certain issues or elements is inherent in Federal Rule of Civil Procedure (FRCP) 56. *See* Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A fact is material if it could affect the outcome of the case. *Id.* at 249. At the summary-judgment stage, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

District courts may grant an unopposed motion for summary judgment if the movant's papers sufficiently support the motion and do not present on their face a genuine issue of material fact. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). The failure to oppose a motion for summary judgment does not permit the court to enter summary judgment by default, but the lack of a response is not without consequences. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013). As FRCP 56(e) explains, "[i]f a party fails . . . to properly address another party's assertion of fact[,] . . . the court may . . . consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3); *Heinemann*, 731 F.3d at 917. But the nonmoving party's failure to respond does not absolve the

moving party from its affirmative duty to demonstrate that it is entitled to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182–83 (9th Cir. 2003).

II.   Background

Crittendon is an inmate at HDSP, and he joined the Behavioral Modification Unit (BMU)[3] on December 21, 2018. Case Notes, ECF No. 40-3 at 2. Although his complaint mainly addresses an incident that occurred on March 12, 2019, the underlying issues began two weeks prior. Informal Grievance Form, ECF No. 6 at 25. On February 26, 2019, Crittendon alleges that Cooper ordered him to take a clothesline down in his cell and that she made sexually harassing remarks after he complied. *Id.* Crittendon told her "not to play with me like that," and he later told her he was going to report her for sexual harassment. *Id.* She then responded: "go ahead and do it and see what happens to you." *Id.* Crittendon then "decided not to [report Cooper] and let it go because of her threat." *Id.*

Then, on March 12, Crittendon decided to take a "bird bath,"[4] so he covered his window for privacy. *Id.* at 23. This violated BMU regulations, so Cooper ordered him to remove the towel covering the window and informed him that he needs to shower during his allotted time. *Id.* Then, according to Crittendon, Cooper said that she could have seen him naked without the towel. *Id.* at 23, 25. Conversely, Cooper alleges that Crittendon did not take the towel down, telling her: "I don't care bitch, shut the f[uc]k up . . . I want a [l]ieutenant down here before I uncover my window[;] this is PREA."[5] Decl. of Cooper, ECF No. 40-14 at 2–3. Neither party

---

[3] The BMU is a special program that aims to "provide inmates with skills and knowledge to enhance their ability to remain in general population . . . and participate in productive activity." BMU Manual 2017, ECF No. 40-2 at 3.

[4] "[I]n prison parlance, a 'bird bath'" involves "bathing in [one's] cell's sink[.]" *Wakefield v. Tilton*, 2009 WL 2705701, at *1 (E.D. Cal. Aug. 25, 2009).

[5] "PREA" refers to the Prison Rape Elimination Act of 2003. This law was designed to study the problem of prison rape; it does not provide a private right of action that allows a prisoner to sue for a violation of the Act. 42 U.S.C. § 15601; 34 U.S.C. § 30302(1) ("[The purpose of the Act is to] establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States."); *see also Sharkey v. Nev. Dep't of Corr.*, 2021 WL 2270670, at *4 (D. Nev. June 3, 2021) (discussing the PREA). But Crittendon seemingly uses this phrase to indicate his desire to file a prison grievance alleging sexual harassment. *See* ECF No. 6

disputes that Crittendon expressed his desire to file a sexual-harassment grievance against Cooper. But Crittendon further asserts that after he asked for a lieutenant, Cooper responded "sarcastical[ly] and condescending[ly]" by asking: "what was that? You don't want to eat?" while she was serving him food. ECF No. 6 at 25. Cooper does not address or dispute these comments in her declaration. *See* ECF No. 40-14 at 2–3.

Crittendon further alleges that Cooper delivered the grievance forms by sliding them partially under his cell door, while Crittendon was inside. ECF No. 6 at 25. The forms did not reach all the way under the door, and when Crittendon tried to grab them, Cooper stepped on his hand. *Id.* at 25–26. She then laughed and said: "this is what happens when [you] cry wolf," referencing the sexual-harassment grievance. *Id.* at 26. Crittendon was placed in lockdown that night and was eventually expelled from the BMU,[6] something that he feared would happen after filing the grievance. *Id.* Crittendon ultimately filed an emergency grievance related to his hand injury. *Id.* at 22. The grievance was denied, and he was told to refile an informal grievance as to the hand issue—which he never did. *See* ECF No. 40-8 at 15–17 (showing that Crittendon was told to file an informal grievance and then failed to do so). But Crittendon did file informal, first-, and second-level grievances for his sexual harassment and retaliation claims before bringing this lawsuit. ECF No. 6 at 32–43. All those grievances were denied. ECF No. 40-8 at 15–17; ECF No. 40-7 at 44.

### III.   Discussion

Cooper moves for summary judgment on four bases: (1) Crittendon failed to exhaust his administrative remedies for his excessive force claim, (2) he cannot establish that Cooper used excessive force to substantiate his claim of cruel and unusual punishment in violation of the Eighth Amendment, (3) he cannot prove his retaliation claim, and (4) Cooper is entitled to

---

at 4, 31 (showing that Crittendon filed a sexual-harassment grievance after he said he would file "a PREA complaint").

[6] Accompanied by evidence, Cooper asserts that Crittendon was placed on lockdown for his response to Cooper's order and his multiple violations of the BMU regulations. *See* ECF No. 40-3 at 2–4. But at the summary-judgment stage, I must construe the facts in the light most favorable to the non-movant.

qualified immunity. *See generally* ECF No. 40. Cooper filed her motion on December 7, 2022, and Crittendon had 14 days to file an opposition. *See* LR 7-2(b). That deadline came and passed, but Crittendon has yet to file a response.

    a. *A genuine dispute of material fact precludes summary judgment on the retaliation claim.*

I begin with Crittendon's retaliation claim because its outcome affects Cooper's other asserted defenses. Crittendon alleges that Cooper violated his First Amendment rights when she threatened him with retaliation for filing a prison grievance and again when he was put on lockdown and expelled him from the BMU. ECF No. 6 at 3–8. Prisoners have a First Amendment right to file prison grievances and to pursue civil rights litigation in the courts. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). Because "[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices." *Id.*

To prevail on a First Amendment retaliation claim in the prison context, a plaintiff must establish (1) that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Id.* at 567–68. Total chilling is not required; it is enough if an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities. *Id.* at 568–69. I find that factor three is satisfied because filing a grievance is protected conduct. *Id.* at 567. Thus, I will address the other four factors for both the verbal threat of retaliation and also for the subsequent lockdown and expulsion from the BMU.

    1. Retaliation analysis: verbal threat

        A. Adverse action

"[T]he mere *threat* of harm" from a prison guard is sufficient to prevail on the adverse-action prong. *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (emphasis in original). Further, the threat need not be specific or explicit; the mere fact that "statements [made] by the defendant" could be "interpret[ed] as intimating that some form of punishment or adverse

regulatory action would follow" is sufficient. *Id.* (citing *Okwedy v. Molinari*, 333 F.3d 337, 343 (2d Cir. 2003)). For example, in *Brodheim v. Cry*, a prison guard wrote "be careful what you write" on a prisoner's grievance form, and the court found that comment constituted a genuine issue of material fact as to whether an adverse action occurred. *Id.* at 1270–71.

Here, Crittendon presents two different instances when Cooper made verbal threats toward him after he stated his desire to file a sexual-harassment grievance against her. The first time, she responded: "go ahead and do it and see what happens to you." ECF No. 6 at 25. The second time, she responded: "what was that? You don't want to eat?" while serving him food. *Id.* at 22. After the first instance, Crittendon decided not to file a grievance, "[letting] it go because of [Cooper's] threat." *Id.* at 25. In both cases, Crittendon alleges that he feared retaliation if he filed a grievance. *Id.* at 5–6, 25. And, like the guard's statement in *Brodheim*, Cooper's comments, by themselves, could be enough to chill the speech of a person of average fitness. *See Brodheim*, 584 F.3d at 1270–71. Thus, I find that Crittendon has provided enough evidence to establish a genuine issue of material fact as to whether Cooper engaged in an adverse action against him.

B.   Causation

To satisfy factor two, Crittendon must show that his protected conduct was the substantial or motivating factor behind the defendant's adverse action. *Id.* at 1271. To do so, Crittendon "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's]' intent" in the challenged conduct. *Id.* (citing *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)). In his complaint and grievances, Crittendon asserts that Cooper's comments immediately followed his statement that he would file a sexual-harassment grievance against her. ECF No. 6 at 5–6, 25. That is sufficient to establish a genuine issue of material fact because it is reasonable to assume that Cooper would not want a grievance filed against her, breeding a retaliatory motive against Crittendon.

## C. Chilling

To satisfy factor four, a plaintiff need not show that his speech was actually inhibited or suppressed, but rather that the adverse action at issue "would chill or silence a person of ordinary firmness." *Rhodes*, 408 F.3d at 568. Further, a prisoner's filing of grievances cannot be used as evidence that the prisoner's First Amendment rights were not chilled. *Id.* at 569. Doing so would "establish a rule dictating that, by virtue of an inmate[] having fulfilled the requirements necessary to pursue his cause of action in federal court, he would be precluded from prosecuting the very claim he was forced to exhaust." *Id.* Here, Crittendon presents evidence that his speech was chilled because he wrote in his grievance that he was afraid of retaliation from Cooper after she made her threatening comments. ECF No. 6 at 25 ("I decided not to [file a grievance] and let it go because of her threat"). But even if his speech was not chilled, a factfinder could make the objective determination that a reasonable person's speech would have been chilled because of Cooper's comments. *Brodheim*, 584 F.3d at 1271. When faced with a threat like that from Cooper, a reasonable prisoner might refrain from filing grievances in the future. Thus, I find that there exists a genuine issue of material fact as to whether a reasonable person would have been chilled by Cooper's comments.

## D. Legitimate penological interest

Lastly, a prisoner must show the challenged action "did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 568. There is no legitimate penological purpose behind threatening a prisoner for filing a grievance. *Brodheim*, 584 F.3d at 1272–73. In *Brodheim*, a prison guard handwrote a warning on the plaintiff's grievance form that he should be "careful what he writes and requests in his administrative grievances." *Id.* at 1265–66. The defendant proffered the "legitimate penological goal of 'prohibiting disrespectful language.'" *Id.* at 1272. The court outright rejected that goal and held that the defendant "cannot escape constitutional scrutiny by citing a legitimate penological interest" for his threat. *Id.* at 1273. The defendant does

not address either comment in her motion, so it is undisputed that Cooper's alleged threat would not have served a legitimate penological goal.

### E.  Conclusion

As to Cooper's verbal threat, I find that Crittendon has presented sufficient evidence to establish a genuine dispute on all five retaliation factors, thus precluding summary judgment.

### 2.  Retaliation analysis: lockdown and BMU expulsion

Crittendon also claims that he was retaliated against when he was placed on lockdown and expelled from the BMU after saying that he intended to file a grievance against Cooper. ECF No. 6 at 7. This is part of the same retaliation claim. It involves the same test, and factors one, three, and four are met, as described supra in the verbal-threat context. However, I must separately analyze whether there is a genuine dispute of material fact that Crittendon's lockdown and expulsion from the BMU were causally related to his statements and whether there existed a legitimate correctional goal for those actions.

### A.  Causal connection

Because Crittendon's lockdown and expulsion from the BMU came after he filed his grievances, he must establish that there was a causal connection between those events. *Bruce*, 351 F.3d at 1289. The timing between a grievance's filing and an alleged act of retaliation can be used as circumstantial evidence to determine a causal connection. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). But there must be more evidence than a mere temporal proximity. *See id.* (holding that the timing evidence was not enough, by itself, to sufficiently establish a causal relationship).

In *Pratt v. Rowland*, the plaintiff was a prisoner serving a life sentence in California. *Id.* at 804. He filed a retaliation claim against the California Department of Corrections because he was transferred to another prison after he gave a television interview claiming that he was innocent and that the FBI framed him. *Id.* The Ninth Circuit held that the timing of the prisoner's media interview could not establish a dispute of material fact that the transfer was an

act of retaliation because the interview happened after the decision was made to transfer the plaintiff, and there was no other evidence to suggest a retaliatory motive. *Id.* at 808. The Ninth Circuit found that the district court erred in the granting of preliminary relief. *Id.* at 810.

In contrast, in *Bruce v. Ylst*, the prison investigated the plaintiff for gang affiliations to determine where he would be housed, but it failed to find sufficient evidence to classify him as a gang member. *Bruce*, 351 F.3d at 1286. The plaintiff was transferred to a second prison, where he was placed in administrative segregation. *Id.* The *Bruce* plaintiff filed grievances while in segregation, and the prison restarted his gang-affiliation investigation. *Id.* at 1287. Two years later, the prison classified the plaintiff as a gang member using the same information. *Id.* A guard allegedly told the plaintiff that the gang classification was due to his grievances from two years prior. *Id.* The Ninth Circuit held that a two-year gap between a prisoner filing a grievance and the alleged act of retaliation was enough to establish a genuine dispute of material fact because the temporal proximity was combined with a prison guard telling the prisoner that the retaliation was in response to his grievance filing. *Id.* at 1287.

For Crittendon's lockdown claim, there is no dispute that he was put on lockdown after this incident. ECF No. 40-14 at 3. Nor is there any dispute that Crittendon was eventually expelled from the BMU. ECF No. 40-3 at 2–3. But Crittendon alleges that his lockdown and expulsion were in retaliation for his grievance filing. ECF No. 6 at 7. Conversely, Cooper presents evidence that the lockdown was actually because Crittendon used "verbally abusive language and aggressive behavior." *Id.*; ECF No. 40-14 at 3. Likewise, for the BMU-expulsion claim, Crittendon alleges that the expulsion was retaliation in response to his filing of grievances. ECF No. 6 at 7, 25. Cooper counters by providing evidence that Crittendon violated BMU regulations on multiple occasions. ECF No. 40-3 at 2–3. Although Crittendon was removed from the BMU more than a month after the bird-bath incident, the temporal proximity—combined with Cooper's alleged statements—provides enough evidence to call into question the reason for the lockdown and the BMU expulsion. *See Bruce*, 351 F.3d at 1288–89.

Thus, I find that there exists a genuine issue of material fact as to whether the lockdown and BMU expulsion were caused by Crittendon filing a grievance.

### B. Legitimate penological goal

Cooper contends that Crittendon's lockdown and expulsion served the legitimate penological purpose of establishing order in the prison. ECF No. 40-5 at 6. But the Ninth Circuit has established that "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." *Bruce*, 351 F.3d at 1289.

In *Bruce*, the plaintiff was put in administrative segregation after the prison restarted his gang-affiliation investigation. *Id.* at 1287. Because the guard allegedly told the plaintiff that the investigation was due to his grievance filing, the court held that those facts "raised a jury issue that the stated penological goals were not legitimate." *Id.* at 1290. The *Bruce* plaintiff conceded "that prisons have a legitimate penological interest in stopping prison gang activity." *Id.* at 1289. But the court concluded that "if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish [the plaintiff] because he filed [a] grievance," they then cannot argue that the action had a legitimate penological purpose even if "[the plaintiff] may have *arguably* ended up where he belonged." *Id.* (emphasis in original). The Ninth Circuit reversed summary judgment and remanded the case for trial. *Id.* at 1289–90.

Here, Crittendon was put on lockdown due to his alleged "verbally abusive language and aggressive behavior." ECF No. 40-5 at 6. Further, Cooper provides evidence that Crittendon was expelled from the BMU because he violated multiple BMU regulations. ECF No. 40-3 at 2–3. And the record does show that Crittendon committed multiple violations after the March 12 incident. *See id.* (Crittendon covered his window with a towel a second time, and he refused to be housed with a cellmate). But those violations occurred *after* the alleged threats on February 26 and March 12. Like *Bruce*—in which the retaliation came two years after the plaintiff filed his

grievances—if those justifications were used as a cover to silence and punish Crittendon for his grievance filing, then a legitimate penological purpose would no longer exist—even if the actions would have been appropriate otherwise. I therefore find that there is a genuine issue of material fact as to what the penological purpose was for Crittendon's lockdown and expulsion from the BMU.

## C.  Conclusion

As for Crittendon's retaliation claim, including both the verbal threat and the subsequent lockdown and BMU expulsion, I find that there exist genuine issues of material fact as to whether Crittendon's constitutional rights were violated. I therefore conclude that summary judgment is inappropriate in this case, unless Cooper can demonstrate her entitlement to qualified immunity.

> b.  *Cooper is not entitled to qualified immunity because a genuine dispute of material fact exists as to whether she violated Crittendon's First Amendment rights, and the protection against retaliation is clearly established law.*

Cooper asserts that she is entitled to qualified immunity on Crittendon's retaliation claim. ECF No. 40 at 12–15. Qualified immunity is an immunity from suit, rather than a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 238 (2009). In evaluating a qualified-immunity claim, courts must consider (1) whether the state actor's conduct violated a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 553 U.S. 194, 200–01 (2001), *overruled in part by Pearson*, 555 U.S. 223 (2009). Either prong may be addressed first, and if the answer to either is "no," then the state actor cannot be held liable for damages. *Pearson*, 555 U.S. at 236.

### 1.  Constitutional right violation

The analysis to determine whether the first prong of the qualified-immunity analysis is satisfied "mirrors the substantive summary judgment decision on the merits." *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) (citing *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002)).

Thus, a prisoner's retaliation claim that survives summary judgment on the merits in turn satisfies this prong of the qualified-immunity analysis. *Id.* As discussed supra subsection *a*, there is a genuine dispute of material fact as to whether Cooper violated Crittendon's rights. Thus, this prong of the qualified-immunity analysis is satisfied.

### 2. Clearly established law

Whether a constitutional right is clearly established is purely a question of law for the court to decide. *Elder v. Holloway*, 510 U.S. 510, 511 (1994). For a constitutional right to be clearly established, a court must define the right at issue with specificity and "not . . . at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). And that appropriate level of specificity must be defined before a court can determine if the right was established. *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009). Otherwise, plaintiffs would be able to bypass qualified immunity by alleging violations of extremely abstract rights. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The prohibition against retaliatory punishment is clearly established law in the Ninth Circuit for qualified-immunity purposes, and the Ninth Circuit has defined it with a high degree of specificity. *Bruce*, 351 F.3d at 1290; *Rhodes*, 408 F.3d at 569; *Brodheim*, 584 F.3d at 1269; *Shepard*, 840 F.3d at 693. For example, in *Brodheim*, the Ninth Circuit held that a prison guard's indirect threat written on a grievance form was an act of retaliation that could have chilled the plaintiff's speech. *Brodheim*, 584 F.3d at 1269. Likewise, in the 2016 case, *Shepard v. Quillen*, a correctional officer suggested that the plaintiff recant his grievance or else he would be placed in administrative segregation. *Shepard*, 840 F.3d at 688. The prisoner did not withdraw his grievance, and he was placed in administrative segregation. *Id.* In *Shepard*, the Ninth Circuit held that changing a prisoner's status or prison housing in retaliation for filing a grievance constitutes clearly established law. *Id.* at 693–94. Lastly, in *Bruce*, the Ninth Circuit held that a two-year gap between the filing of a grievance and a change in prison housing could amount to retaliation. *Bruce*, 351 F.3d at 1289–90.

The decisions in *Brodheim*, *Shepard*, and *Bruce* were issued years before the incidents in this case occurred. Because of *Brodheim*, Cooper was put on notice that a single threatening comment could be an act of retaliation. Because of *Shepard*, Cooper was put on notice that a change of an inmate's housing after a prisoner threatens to file a grievance could constitute retaliation. And because of *Bruce*, Cooper was on notice that a change in a prisoner's housing could amount to retaliation months after the initial threat to file a grievance. Here, Cooper threatened Crittendon when he told her he wanted to file a grievance; and then he was put on lockdown and eventually expelled from the BMU. Based on these cases, it was clearly established at the time of these events that Cooper's conduct could amount to retaliation. Thus, I find that the law was sufficiently clear and satisfies the other prong of the qualified-immunity analysis. Cooper is not entitled to qualified immunity on the retaliation claim, and that claim proceeds to trial.

  c. *A genuine dispute of material fact precludes summary judgment on the excessive-force claim.*

  Crittendon also brings an excessive-force claim against Cooper. ECF No. 6 at 2. Cooper argues that she is entitled to summary judgment on this claim because Crittendon did not exhaust his administrative remedies and because there is no evidence that Cooper used excessive force. ECF No. 40 at 6–9. However, Cooper cannot rely on Crittendon's failure to exhaust his administrative remedies because the reasonable fear of retaliation can excuse the Prison Litigation Reform Act's (PLRA) exhaustion requirement. *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 792 (9th Cir. 2018). Further, I find that Crittendon establishes a genuine dispute of material fact as to whether Cooper stepped on his hand in violation of the Eighth Amendment.

    1. Exhaustion of administrative remedies

  Under the PLRA, a prisoner may not file suit challenging conditions in a correctional facility unless they have exhausted the administrative remedies at the facility. 42 U.S.C. § 1997e(a); *Rodriguez*, 891 F.3d at 792. The exhaustion requirement gives an agency the opportunity to correct its own mistakes before being dragged into federal court, and it promotes greater efficiency and economy in resolving claims. *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir.

2015). But, a fear of retaliation can excuse the PLRA's exhaustion requirement if the prisoner shows that (1) he actually believed prison officials would retaliate against him if he filed a grievance and (2) "a reasonable prisoner of ordinary firmness would have believed that the prison official's action communicated a threat not to use the prison's grievance procedure and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance." *Rodriguez*, 891 F.3d at 792 (citing *McBride*, 807 F.3d at 987). Crittendon, in his grievance, stated that he feared retaliation from Cooper after her February comments. ECF No. 6 at 25 ("I decided not to [file a grievance] and let it go because of her threat"). And what constitutes a "reasonable prisoner of ordinary firmness" is a fact determination and is thus inappropriate at the summary-judgment stage. *See Brodheim*, 584 F.3d at 1271 ("We cannot say that, as a matter of law based upon the record before us, [that plaintiff] failed to meet this objective standard. A reasonable person may have been chilled."). Therefore, Crittendon satisfies both factors of the test, and Cooper may therefore not rely on the affirmative defense that Crittendon failed to exhaust his administrative remedies under the PLRA for the excessive-force claim.

### 2. Excessive-force analysis

Crittendon argues that Cooper used excessive force on him when she stepped on his hand after sliding the grievance form into his cell. Cooper denies that this ever happened, but because Crittendon has provided evidence that the incident occurred, I must determine if it establishes a genuine dispute of material fact sufficient for this claim to survive summary judgment. I find that it does.

In analyzing claims of excessive force under the Eighth Amendment, courts must determine whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (citing *Hudson v. McMilian*, 503 U.S. 1, 8 (1992)). The inquiry "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of

causing harm." *Id.* To make this determination, the court may consider the five following factors: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response. *Id.* at 1141.

A prisoner need not suffer a serious injury in order to bring a cognizable Eighth Amendment claim for cruel and unusual punishment. *Hudson*, 503 U.S. at 4. The "Eighth Amendment forbids the application of force . . . 'for the very purpose of causing harm.'" *Hoard v. Hartman*, 904 F.3d 780, 782 (9th Cir. 2018) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). Thus, the focus of the inquiry is on "the lack of any penological justification for harming the inmate." *Id.* at 787. Although not every seemingly unnecessary "push or shove" will give rise to a federal cause of action, the force must be used in "a good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 9; *Whitley*, 475 U.S. at 320–21. So even if there is no lasting physical harm, if there could be no penological purpose for the use of force, then an inmate can successfully bring an Eighth Amendment claim. *Hoard*, 904 F.3d at 788.

Crittendon provides, in a sworn declaration, that Cooper stepped on his hand after she slid the grievance forms under his door. ECF No. 6 at 25–26. But he does not provide evidence that he suffered any lasting damage or harm from Cooper's alleged acts. *See generally* ECF No. 6. But Cooper denies that the hand-stepping ever occurred, and thus, she does not provide any legitimate reason for the alleged use of force. *See* ECF No. 40-14 at 2–3. Because there is no proffered penological purpose behind an officer's decision to step on an inmate's fingers when he is trying to grab documents under his door, there cannot be an analysis on: (1) the need to use the force; (2) the relationship between that need and the amount of force used; (3) the perceived threat used in reaction to that force; and (4) the effort made to temper the severity of a forceful response. And, without further evidence, aside from Crittendon's affidavit saying that this incident occurred, this becomes a credibility determination. There is simply not enough

15

argument at this stage of the litigation on which I could decide this claim. The jury must decide whether Cooper stepped on Crittendon's hand, and if she did, whether that force was justified by the situation under the excessive-force test. I therefore deny Cooper's motion for summary judgment as to the excessive-force claim.

IV.   Conclusion

IT IS THEREFORE ORDERED that Cooper's motion for summary judgment [ECF No. 40] is DENIED. Crittendon's claims against Cooper for excessive force and retaliation proceed to trial.

IT IS FURTHER ORDERED that this case is **REFERRED to the magistrate judge for a mandatory settlement conference** on the two remaining claims. The parties' deadline to file their proposed joint pretrial order is stayed until 10 days after the settlement conference, should this case not resolve.

DATED: May 1, 2023

_____
Cristina D. Silva
United States District Judge